395 So.2d 972 (1981)
Cathy Ann B. McGOUGH, etc.
v.
Francis B. SLAUGHTER et al.
79-396.
Supreme Court of Alabama.
March 6, 1981.
*974 Terry P. Wilson of Turner, Wilson & Christian, Montgomery, for appellant.
Robert C. Black of Hill, Hill, Carter, Franco, Cole & Black, Montgomery, and J. L. Chestnut of Chestnut, Sanders & Sanders, Selma, for appellees.
TORBERT, Chief Justice.
The issue presented in this appeal relates to the admissibility of the results of a blood test for intoxication where the blood sample is taken from a deceased person by an embalmer. More specifically, we must decide whether blood alcohol test results from samples obtained by authority of Code 1975, § 22-19-80, are per se admissible. We find that compliance with § 22-19-80 alone does not make the blood tests admissible, and we hold that general evidence principles regarding admissibility of scientific test results are applicable. Because the circuit court admitted evidence for which no predicate was laid, we reverse.
A pickup truck driven by Thomas McGough collided with a tractor-trailer driven by Francis Slaughter. The incident occurred at night, and, at the time of the collision, the Slaughter tractor-trailer was blocking the road on which Mr. McGough was traveling. The impact killed Mr. McGough, and his body was taken to Jones Funeral Home in Greenville, Alabama, for burial preparation.
At the direction of a law enforcement official, a licensed mortician took a blood sample from the body of Mr. McGough. The mortician, Larry Jones, was not a doctor, registered nurse, or licensed clinical lab technologist or technician. Laboratory analysis showed alcohol in the blood sample amounted to .18 grams percent by weight.
Cathy McGough, the administratrix of the estate of Mr. McGough, filed suit against Mr. Slaughter, alleging the wrongful death of Mr. McGough. The attorney for plaintiff filed a motion in limine, seeking to exclude evidence of the blood test and results. At the motion hearing, plaintiff argued that the blood test was not taken in conformity with either Code 1975, § 32-5-193, or the Court of Civil Appeals interpretation of that statute in the case. Lankford v. Redwing Carriers, Inc., 344 So.2d 515 (Ala.Civ.App.1977). The defendant argued that the legislature abrogated Lankford by passing Code 1975, §§ 22-19-80 through -82. The judge agreed with defendant and denied plaintiff's motion.
At trial defendant's attorney sought to introduce results of the test. Over plaintiff's objection, the test results were revealed to the jury. Plaintiff's motions for directed verdict, judgment notwithstanding the verdict, and for new trial challenged, among other things, the admission of the results of the test on the ground the results were from tests not taken in conformity with Code 1975, § 32-5-193, and on the ground no proper predicate was laid before admission of the results. All the motions were denied, and plaintiff appealed from the trial judge's failure to grant a new trial.

I.
As a preliminary matter, we address defendant's motion to dismiss plaintiff's appeal. As grounds for his motion, defendant asserts that in her brief plaintiff does not argue error in the judge's failure to grant a new trial. Instead, plaintiff argues there was error in the judge's ruling on the motion in limine and in his ruling on the admissibility of the alcohol blood test results. Defendant, however, fails to recognize that the scope of appellate review is not limited by the notice of appeal designation of the judgment or order appealed, whether appeal is taken from the final judgment or from the order denying a motion *975 for new trial. ARAP 3(c); Reach v. Reach, 378 So.2d 1115 (Ala.Civ.App.1979). Except in rare instances (e.g., sufficiency of the evidence), errors asserted at trial may be raised on appeal without regard to whether such errors were raised, or whether adverse rulings were invoked, in the motion for new trial. ARAP 4(a)(3); Reach v. Reach, 378 So.2d 1115 (Ala.Civ.App.1979). The issues raised in plaintiff's brief are properly before us, and defendant's motion is denied.[*]

II.
The legislature has by statute remedied many of the problems involved in laying a foundation for admission of intoxication test results, at least where the action arises from operation of a vehicle. See Code 1975, § 32-5-193.
Under [such a statute], the questions of relevancy, and to a large extent of weight, of the evidence, have thus been legislatively resolved. The [statutory intoxication] presumptions have been upheld by the courts ... and the prescription for test procedures adopted by the state health agency has been taken as acceptance of the general reliability of such procedures in showing blood-alcohol content.
E. Cleary, McCormick's Handbook on the Law of Evidence § 209 at 513 (2d ed. 1972) (footnotes omitted).
A party offering results from tests shown to be given in conformity with the statute is relieved of the burden of laying the extensive predicate generally necessary for admission of scientific test results.
Code 1975, § 32-5-193, applies to admission of blood alcohol test results into evidence.
§ 32-5-193. Admissibility of results of test in evidence; presumptions; how and by whom tests made; immunity from liability; evidence of refusal to submit to test.
(a) Upon the trial of any civil or criminal action or proceeding arising out of acts alleged to have been committed by any person while driving a vehicle while under the influence of intoxicating liquor, the amount of alcohol in the person's blood at the time of the chemical test or tests authorized by this division as shown by chemical analysis of the person's blood, urine or breath shall be admissible as evidence ....
(b) Chemical analyses of the person's blood, urine or breath to be considered valid under the provisions of this section shall have been performed according to methods approved by the state board of health and by an individual possessing a valid permit issued by the state board of health for this purpose. The state board of health is authorized to approve satisfactory techniques or methods, to ascertain the qualifications and competence of individuals to conduct such analyses, and to issue permits which shall be subject to termination or revocation at the discretion of the state board of health.
(c) Only a physician, registered nurse or duly licensed clinical laboratory technologist or clinical laboratory technician acting at the request of a law-enforcement officer may withdraw blood for the purpose of determining the alcoholic content therein. This limitation shall not apply to the taking of breath or urine specimens.
Code 1975, § 32-5-193 (repealed, 1980 Ala. Acts, No. 80-434, § 15-106, replaced by Code 1975, § 32-5A-194 (Supp.1980)). Strict compliance with the requirements of § 32-5-193 is a condition precedent to the admissibility of the results of tests made pursuant to the statute. Patton v. City of Decatur, 337 So.2d 321 (Ala.1976); Lankford v. Redwing Carriers, Inc., 344 So.2d 515 (Ala.Civ.App.1977).
In the case of Rehling v. Carr, 295 Ala. 366, 330 So.2d 423 (1976), we enforced the plain wording of the statute to allow only *976 physicians, nurses, or laboratory technologists or technicians to take blood samples for alcohol content analysis. The plaintiff widow brought an action for injunction against the state toxicologist and a coroner seeking the return of a blood sample taken by the coroner from the body of the widow's deceased husband. Since there was no statutory authorization for a coroner to take blood samples for alcohol content analysis, we required that the blood sample be returned to the widow.
Although Code 1975, §§ 22-19-80 through -82, had not been enacted at the time, the Court of Civil Appeals decided that blood alcohol test results were inadmissible where the blood samples were taken by a mortician. In the case of Lankford v. Redwing Carriers, Inc., 344 So.2d 515 (Ala. Civ.App.1977), the petitioner assigned as error the trial court's ruling that Ala.Code tit. 36, § 155 (1940) (Recomp.1958) (Supp.1973) (or Code 1975, § 32-5-193), applied only to cases in which living persons were being prosecuted for some violation of the law. The Court of Civil Appeals agreed with the petitioner and found that the statute applied to blood alcohol tests performed on the dead as well as the living. Additionally, the Court gave effect to the specific wording of the statute which made intoxication test results admissible not only in criminal actions, but also in civil proceedings.
Defendant argues that the legislature responded to the ruling in Lankford by enacting Code 1975, §§ 22-19-80 through -82. Defendant asserts that the sections make admissible test results derived from blood taken by a licensed embalmer.
§ 22-19-80. Authority of coroners, deputy coroners, state toxicologist and law enforcement officers; purpose of taking samples.
(a) Each duly elected or appointed coroner in the state of Alabama is authorized to withdraw and retain or direct the withdrawal and retention of blood and/or urine from the dead body of a person who died unattended by a physician, or who died under suspicious circumstances, or where there is reasonable cause to believe the person died from unnatural and/or unlawful causes.
(b) Each duly elected or appointed deputy coroner shall have the same authority to withdraw and retain or direct the withdrawal and retention of a blood and/or urine sample when acting for the coroner.
(c) The state toxicologist and his designated or appointed assistants are authorized to withdraw and retain or direct the withdrawal and retention of blood and/or urine from the dead body of a person who died unattended by a physician, or who died under suspicious circumstances, or where there is reasonable cause to believe the person died from unnatural and/or unlawful causes.
(d) A law enforcement officer investigating a fatal motor vehicle accident is authorized to direct the withdrawal and retention of blood and/or urine from the body of any such fatality.
(e) The purpose of any withdrawal and retention of blood and/or urine shall be for analyses or studies to assist in determining the cause, manner and circumstances of death, including a chemical or other test or tests for drugs and/or poisons.
§ 22-19-81. Persons who may be directed to withdraw samples.
Only a physician, registered nurse, duly licensed clinical laboratory technologist, clinical laboratory technician, mortician, licensed embalmer or licensed practicing embalmer may be directed by a coroner, deputy coroner, a law enforcement officer or the state toxicologist or his designated or appointed assistants to withdraw blood and/or urine for the purpose or purposes cited in section 22-19-80.
§ 22-19-82. Exemption from civil and criminal liability.
(a) No coroner, deputy coroner, the state toxicologist and his designated or appointed assistants, mortician, licensed embalmer, physician, registered nurse, duly licensed clinical laboratory technologist or clinical laboratory technician or employers of the aforementioned persons *977 shall incur any civil or criminal liability as a result of the proper withdrawal or securing or retention of a blood and/or urine specimen as provided by this article.
(b) The state toxicologist and his designated or appointed assistants shall incur no civil or criminal liability as a result of the proper analyses or studies of blood and/or urine specimens withdrawn and retained as provided in this article.
Code 1975, §§ 22-19-80 through -82.
In particular, defendant believes § 22-19-80(e) speaks to the admissibility of the results of tests taken pursuant to the statutes.
We do not agree with defendant, because the sections do not address the evidentiary value accorded blood sample tests when the blood samples are taken by a mortician. They authorize state officers to collect blood or urine samples from the bodies of persons who die under "suspicious" or certain other circumstances and relieve the officer of civil or criminal liability which might be incurred. The purpose of the statutes, as set forth in § 22-19-80(e), is to provide an investigative tool to aid officials in their determination of the cause, manner or circumstances of death.
The procedures established by § 32-5-193 insure reliability of test results, but §§ 22-19-80 through -82 have no procedure by which reliability of results is assured. In order to be reliable, and thus relevant to the matter at issue, results must be from generally accepted tests conducted under conditions which do not impeach the reliability of the testing procedure. Absent the predicate mandated by general evidence principles and without statutory procedure and other assurances of uncontaminated test results, the bare fact the legislature gave certain persons authority to take test specimens does not render the results of the tests admissible as evidence.
Since we have decided that § 22-19-80 does not control the admissibility of the blood alcohol test results, for the results to have been admissible, either defendant must have shown the tests were taken in conformity with § 32-5-193, or he must have laid the proper foundation for their admission under general evidence principles. It is manifest the tests were not taken pursuant to the guidelines set down in § 32-5-193, and we have examined the record and found absolutely no attempt to lay the foundation otherwise necessary. We find that the trial judge erred when it admitted the test results over plaintiff's objection.
Because the foregoing issue is resolved in plaintiff's (appellant's) favor, we do not address her challenge to the blood sample chain of custody.
MOTION DENIED; REVERSED AND REMANDED.
FAULKNER, JONES, SHORES, EMBRY and BEATTY, JJ., concur.
MADDOX, ALMON and ADAMS, JJ., concur in part and dissent in part.
MADDOX, Justice (concurring in part; dissenting in part).
The majority opinion, applying a rule of strict construction to the Alabama Chemical Test for Intoxication Act (Code 1975, § 32-5-190, et seq.), the so-called "Implied Consent" law, correctly proves that an embalmer is not authorized to draw blood from a dead body under the provisions of that law, and correctly concludes that the statutory presumption of intoxication provided for in that law would be inapplicable in this case because the blood sample was not drawn by a person authorized under the "Implied Consent" law to draw the blood sample. In other words, the majority correctly makes a distinction between the admissibility of evidence under traditional rules of evidence and a statutory presumption on the effect of evidence. I, therefore, concur in those portions of the majority opinion which conclude that the statutory presumption of intoxication provisions of the "Implied Consent" law were not available in this case, and I also concur in those portions of the majority opinion which conclude that the results of a chemical test of blood is admissible, whether the presumption of intoxication *978 is available or not, provided a proper predicate is laid. I dissent from that portion of the opinion which holds that a proper predicate was not laid in this case.
The plaintiff filed a motion in limine to exclude the evidence of the results of the blood sample.
Larry Jones, a licensed embalmer and funeral director, testified at the hearing on the motion in limine and also at trial. Jones testified, at trial, that he took the blood sample from the dead body of Thomas McGough at the request of a State trooper and explained in some detail how he drew the blood sample. He testified:
Q. All right, and did you get it in a tube of some kind, or what?
A. I got it in a regular blood sample tube, a vial.
Q. All right, had that tube been cleaned out, cleaned thoroughly before you put Mr. McGough's blood in it?
A. It was packaged. I purchase the tubes of this nature from the local drug store, and it was packaged, and I took it out of the package and put the blood in it.
Q. In other words, it never had been used?
A. No.
Q. Was it, in your judgment, uncontaminated with any foreign matter whatsoever?
A. In my judgment, it was.
Q. And, did you seal it up?
A. Yes, sir, and tagged it.
Q. Sealed it and tagged it?
A. With my name, date and my signature.
On cross examination, Jones testified:
A. The blood that I collectedthe first blood that came from the jugular vein went into the blood sample vial.
Q. How did you get it from the vein into the vial?
A. By placing the vial to the opening in the vein where I had made the incision, then placing pressure from the lower part of the vein, then.
Q. Where did you cut him, on his neck, or arm?
A. The right common carotid artery, was what was raised.
Q. All right, so what ever else was in that area was also picked up in the test tube?
A. The sample was taken from that area, the test tube had to touch that area, yes.
Q. But, you do not use a jugular tube at all?
A. Yes, I did, after.
Q. To actually get the blood from the body into the container?
A. I did not use that at all to get the blood into the container, no.
Q. You just took a test tube and stuck it up to where you cut a hole, and you got the blood out, is that correct?
A. That's correct.
Q. Okay, you didn't clean that area around there before you cut the man?
A. No, sir.
Q. You didn't sterilize it at all?
A. No, sir.
Q. And, I believe you testified that you received no instructions, no training at all from the Alabama State Board of Health, of any rules or regulations that they may have promulgated regarding the preservation of blood samples?
A. That's correct, I have not.
Plaintiff's attorneys made the following specific objections:
BY MR. THORNTON: Judge, at this point, we would object to Mr. Jones's testimony and ask it to be excluded, and any other testimony regarding this blood sample. Based on his testimony, Mr. Jones clearly stated that the procedures were not used to insure that the blood sample was kept in an uncontaminated state. Mr. Jones testified on cross examination that he had received nothing from the State Board of Health as to how to *979 properly preserve the blood, how to keep it from becoming contaminated, he testified that it laid out there on a table some hour and fifteen minutes before it was delivered to Trooper Hammonds, and we feel that unless the Defendants in this case can show that this blood was kept in an uncontaminated state and that it was withdrawn properly, that any other testimony that they may have, according to both these statutes that we cited in our previous motions, and they both require the proper drawing of the blood, and a proper preservation of it, and I submit that when you use a test tube to make a cut on somebody's body, then just stick it up there without sterilizing it, without doing anything, that you certainly have a strong possibility of contamination of that sample, and that would invalidate any tests that may be later run on it.
BY MR. WILSON: Your Honor, secondly, we would again note that the Code of Alabama, 32-5-193-C, notes only certain people who are authorized to take blood tests for the purposes of determining the amount of alcohol content therein, and Mr. Jones has clearly stated he is not one of these people.
BY MR. THORNTON: Yes, and one purpose of this statute, which is 32-5-193, andwell, the entire statute is to insure that the specimens will be taken according to proper procedures and to insure that no contaminants could be in the specimen, and we submit to Your Honor again that 22-19-80 and 81 are strictly to allow the blood to be taken. It says nothing about admissibility later in Court. If you will look at this particular statute, 32-5-191
BY MR. WILSON: And, 193.
BY MR. THORNTON: It says the reason is to make sure that the procedure is followed to be sure that there is no contamination.
BY THE COURT: I think that 193 has to do with the presumptions that follow. I don't think they are entitled to any of the presumptions that go with it, but I think they are entitled to take it, and your motion is denied. [Emphasis supplied.]
The record also shows that a state toxicologist who examined the blood sample testified as follows:
Q. Did you test it?
A. Yes, sir.
Q. Would you tell us the blood alcohol content that you found?
A. Yes, sir, I identified ethyl alcohol in the specimen at a level of .18 grams percent by weight.
Q. All right, would blood taken by cutting an artery and placing a vial in the area where the blood would drain directly from the artery into the vial, is that an accepted way of taking blood?
A. That is not the normal way, but I do not see how it could have contaminated the same.
Q. Now, in your judgment, that sample taken in that fashion would be uncontaminated?
BY MR. ESPY: Objection.
BY THE COURT: Overruled, this man is an expert, he can testify.
By Mr. Black:
A. In this particular case, I do not see where it would contaminate it, as far as ethyl alcoholic content.
Q. All right, Mr. Adair, what level of blood alcohol is considered intoxicating?
BY MR. THORNTON: Objection.
BY THE COURT: Sustained.
By Mr. Black:
Q. .18 level ofdid you say ethyl alcohol?
A. Yes, sir.
Q. What is the source of ethyl alcohol?
A. It is the source of the fermentation of sugar.
Q. Is it what we commonly call whiskey or beer?
A. Those are two sources of it, there are many others, however.
Q. Do you have a judgment as to whether or not a person with .18 grams of ethyl alcohol would be drunk or not?
*980 BY MR. THORNTON: Objection.
By Mr. Black:
Q. And, based upon your experience and training
BY THE COURT: Sustained, I'll let you ask him what a manwhat actions a man like that could do.
By Mr. Black:
Q. Could you describe what actions a man with that level of alcohol in his blood would be able to perform?
BY MR. THORNTON: Objection, no proper predicate to ask that question.
BY MR. BLACK: He's an expert, Your Honor.
BY MR. THORNTON: I don't think he's an expert on the effects of alcohol on each individual person.
BY THE COURT: If he can testify that he knows what they are, I'll let him answer.
By Mr. Black:
Q. Do you know what the effects that this would have?
A. Well, first of all, I'd like to say that there are broad ranges for these. In this particular area, generally you would have mental confusion, lack of coordination, and inability to perform certain learned skills efficiently.
Q. Would it affect his driving?
A. Yes, sir, in my opinion, it would.
Q. Would it affect his judgment?
A. Yes, sir.
Q. How about reaction time?
A. Yes, sir.
Q. Would it be considered driving under the influence of liquor?
BY MR. THORNTON: Objection.
BY THE COURT: Sustained.
BY MR. BLACK: That's all.
Based on the foregoing, I am completely convinced that a proper predicate was laid to permit the introduction into evidence of the blood sample. Consequently, I must respectfully dissent from the conclusion by the majority that no proper predicate was laid.
ALMON and ADAMS, JJ., concur.
NOTES
[*] In any event, plaintiff properly presented the issues because each of the issues argued was in fact included as a ground in plaintiff's motion for a new trial. See, State v. Ward, 293 Ala. 516, 306 So.2d 265 (1975) (decided before adoption of the ARAP).